**Gail HOGSTON and Harlan Hogston, Plaintiffs-Appellants,**

v.

**Walter SCHROYER, Defendant-Appellee.**

**No. 1–782A176.**

Court of Appeals of Indiana, First District.

May 23, 1983.

Rehearing Denied July 6, 1983.

James R. Fisher, Joseph A. Schenk, Ice, Miller, Donadio & Ryan, Indianapolis, William R. Pfister, Bielby & Pfister, Lawrenceburg, for plaintiffs-appellants.

David S. Allen, Randall R. Riggs, Locke, Reynolds, Boyd & Weisell, Indianapolis, John F. Stroup, Lawrenceburg, for defendant-appellee.

RATLIFF, Judge.

## STATEMENT OF THE CASE

Appellants Gail and Harlan Hogston appeal from a negative judgment of the Dearborn Circuit Court entered on a jury's verdict in an action for damages and loss of consortium. We reverse and remand.

## FACTS

Gail Hogston was injured in a collision involving the motorcycle she was driving and a van driven by Schroyer. At the conclusion of the trial, the court entered judgment against appellants consistent with the jury's verdict. From that decision, Hogstons now appeal.

## ISSUE

Hogstons raise four issues for review. However, one issue is dispositive of the appeal. Rephrased, it is as follows:

Did the trial court err in refusing to give plaintiffs' tendered instruction number eight?

## DISCUSSION AND DECISION

The trial court erred in refusing to give the plaintiffs' tendered instruction number eight.

At the conclusion of the trial, plaintiffs tendered their instruction number eight. That instruction stated:

"The fact that Plaintiff was driving a motorcycle at the time of this occurrence, standing alone, may not be considered by you as evidence of contributory negligence or incurred risk on the part of the Plaintiff. Motorcycles are licensed by the State and are permitted to use the roads in the State. Their operators are entitled to the same legal protection that is afforded operators of any other vehicles. You may therefore not consider the possibility that motorcycles may be more hazardous than automobiles, to be any evidence that the Plaintiff was negligent merely by operating such a vehicle."

Record at 30. The trial court refused the instruction and appellants now assign the refusal as reversible error.

■ It is well settled that when considering whether error results from the trial court's refusal to give a tendered instruction, this court must determine whether (1) the tendered instruction correctly states the law, (2) there is evidence in the record to support the giving of the instruction, and (3) the substance of the tendered instruction is covered by any other instructions that are given. *Dahlberg v. Ogle,* (1978) 268 Ind. 30, 40, 373 N.E.2d 159, 164–65; *Duchane v. Johnson,* (1980) Ind.App., 400 N.E.2d 193, 195. In addition, to demonstrate reversible error, the complaining party must show both an erroneous ruling and prejudice resulting therefrom. *Cunningham v. Cunningham,* (1982) Ind.App., 430 N.E.2d 809, 813. Only upon such a showing will this court reverse the judgment of the trial court.

■ Appellee Schroyer does not contest the propriety of the tendered instruction concerning its correctness as a statement of law. There is no doubt but that the instruction is a correct statement of the law. However, Schroyer does contend that there is no evidence to support the giving of the instruction. At trial, one of Gail Hogston's treating physicians, Dr. Thomas S. Berger, testified by video tape deposition. Upon cross-examination by defendant's counsel, the following colloquy took place:

"Q. Dr. Berger, in your practice of neurosurgery, have you had occasion to see other patients with brachial plexus injury to the type Gail Hogston had?

"A. Yes.

"Q. And for one engaged in the practice of neurosurgery, injuries to the brachial plexus are seen somewhat frequently, are they not?

"A. I would say in the hospital where I work, where we see a fair amount of trauma, I probably see two or three patients like that a year. I guess that's fairly frequently.

"Q. Doctor, are motorccycle [sic] accidents one of the more common causes of this type of injury?

"A. Yes.

. . . .

"Q. Isn't it a fact that motorcycle accidents are the most common cause of a stretch injury such as Gail Hogston has had?

"A. I don't have the statistics in front of me, but I would say that's probably correct.

"Q. Doctor Berger, are you familiar with a work entitled, *Nerves and Nerve Injuries,* by Sir Sidney Sunderland?

"A. That's correct.

. . . .

"Q. . . . I want to direct you particularly to Chapter 65 and ask you to tell the jury what the title of Chapter 65 is, if you will, sir.

"A. Brachial Plexus Lesions Due to Compression, Stretch and Penetrating Injuries' [sic].

"Q. O.K. Turn to, if you would, page 872.

"A. O.K.

"Q. And I want to read to you under—a portion of what appears under subtwo, 'Tractions and Lesions', which I believe you've testified as [sic] the same as a stretch injury?

"A. Yes.

. . . .

"Q. And about halfway through the paragraph, 'However, the chief offenders today,' and they're talking of the types of injury, I believe, 'are the combination of automobiles, motorcycles, careless driving, alcohol and improved, but often crowded and busy highways which invite excessive speed. This dangerous condition has not only greatly increased the incidence of plexus injuries, but also their severity and with it an inevitable increase in the incidence of nerve root avulsion. That most closed traction injuries follow trauma to the neck and shoulder in motorcycle and automobile accidents as shown in Table 65.1'. Doctor, what I have just read to you, do you agree with that?

"A. Yes.

"Q. And is that also your opinion?

"A. I think I would agree with that in general, yes.

"Q. Now, when they refer to Table 65.1, does that Table appear there on page 872?

"A. Yes.

"Q. And what is the title of the Table?

"A. 'Causes of Brachial Plexus Injuries'.

. . . .

"Q. O.K., Doctor, are there four columns?

"A. Yes.

"Q. And what do the four columns represent?

"A. Different authors and their experience with accidents.

"Q. And three of them appear to have had a category for motorcycle accidents, do they not?

"A. That's correct.

. . . .

"Q. Now, referring to the three studies that had a category for motorcycle accidents, would you please state what the studies show?

"A. All show that the majority of the injuries were of motorcycle accidents.

"Q. In fact, the Bonney Study done in 1959, which reported a total of 29 cases, 22 of them were—would be under motorcycle accidents, were they not?

"A. That's correct.

"Q. And the Yoeman & Seddon Study of 1961, out of 36, 27 were caused by motorcycle accidents?

"A. That's correct.

"Q. And the Wynn-Parry shows 52 caused by motorcycle accidents and another 28 by other road traffic accidents and then other causes of far lesser numbers, is that correct, Doctor?

"A. That's correct.

"Q. What is the correlation, Dr. Berger, between a motorcycle accident and excessive speed?

"MR. PFISTER: I object. The witness is not qualified to make an answer to that question.

"Q. Doctor, you may answer the question.

"A. My feeling about motorcycle accidents, you know, runs along several lines. I think that one, it's a small vehicle and other people tend not to see it. I do believe that they frequently travel fast, but many times they are injured even when they're not traveling fast because people don't see them that they're going down the road. I think they are dangerous because they're small and unprotected whether at any speed.

"Q. Now, Dr. Berger, directing your attention to page 874 of Sir Sidney Sunderland's work, there is a subparagraph entitled, 'Displacement of the Trunk on the Fixed Forelimb'. Do you see that? In the . . .

"A. Yes.

"Q. . . . left hand column toward the binding? Is that description consistent with the mechanism of Gail Hogston's injury?

"A. I don't really know because I don't know what the mechanism of her injury was.

"Q. Well, assume she was riding on a motorcycle and at the moment of impact she left the motorcycle and landed on the ground.

"A. She was the driver?

"Q. She was the driver, yes, sir. Is that mechanism of injury at least consistent with what she experienced?

"A. That could be one mechanism.

"Q. Yes.

"A. The other mechanism would be that we know that she had a fracture of her arm and it may have been related to the way she landed on the ground, for example. I don't know.

"Q. But I'm not saying it's the mechanism, it's simply consistent with the injuries she has experienced and what she was experiencing on the motorcycle?

"A. Certainly could be, yes.

"Q. Would you please read for the jury the paragraph starting, 'Displacement of the Trunk on the Fixed Forelimb'?

"A. These injuries occur when, for example, one, a speeding motorcycle is suddenly arrested in a collision and the rider still firmly gripping the handlebars is thrown violently foreward.

. . . .

"Q. Number one certainly is consistent with the accident. Doctor, is that correct to say that generally assuming there is to be a collision, the likelihood of a brachial plexus injury occurring to one operating a motorcycle will increase in direct proportion to the speed of the motorcycle? That is, as the speed of the motorcycle increases, the likelihood of such an injury will increase?

"A. I think that would be a reasonable assumption, yes.

"Q. And is that because as the traction force becomes more severe or excessive, there is the increased likelihood that there can be an avulsion of the nerve roots or a severe stretch injury?

"A. That's correct.

"Q. Doctor, is the *New England Journal of Medicine* considered to be an authoritative journal for medical matters?

"A. Yes.

. . . .

"Q. Well, if you were to read an article appearing in the *New England Journal of Medicine,* you would have no reason to doubt its reliability, would you, sir? And what is reported therein? Is that credible?

"A. Yes.

"Q. I would ask that you—let me read to you from this article under 'Mechanism of Injury' and ask if you agree or disagree with the statement made, which I'm going to read to you.

'The most common mechanism of injury to the brachial plexus is traction, which is usually due to forceful distraction of the head from the shoulder in a fall. The kinetic energy imparted to the nerves will be determined by the violence of the trauma and the majority of patients with severe lesions are injured in motorcycle accidents. The mandatory use of safety helmets protects the wearer from a potentially fatal head injury only to survive with an injury to the brachial plexus'.

Do you agree in general with that statement, Dr. Berger?

"A. Yes."

Record at 592–99. It is clear from the general tenor of this questioning that defense counsel sought to convince the jury that Hogston brought about her own injuries by riding the motorcycle. This is tantamount to arguing that Hogston was negligent in choosing the motorcycle as a means of travel, something which the law of this state does not recognize. The fact that such injuries occur more frequently in motorcycle accidents is undeniably irrelevant to the issue of negligence. As such, there was more than sufficient evidence in the record to support the giving of plaintiffs' tendered instruction number eight.[1]

Schroyer also argues that plaintiffs' tendered instruction number eight was adequately covered by the substance of other instructions. We cannot agree. While the court gave instructions tendered by both parties concerning negligence and contributory negligence, no other instruction in sub-

---

1. Appellee maintains that counsel was merely attempting to establish a relationship between a motorcyclist's speed and the severity of his injuries. However, we note from the record presented above that counsel made no effort to distinguish between legal and illegal speeds, or what indeed could be considered excessive speed. Instead, counsel succeeded in eliciting from the witness an opinion that motorcycles are dangerous "at any speed." Record at 596.

stance could or would have corrected the misapprehension that defendants sought to introduce in the minds of the jurors. Having met the criteria of *Dahlberg*, Hogstons were entitled to such an instruction.

Finally, Schroyer argues that even if the failure to give the instruction is error, it is not reversible error because plaintiffs suffered no prejudice thereby. While this court will not presume prejudice, *Atwood v. Prairie Village, Inc.,* (1980) Ind.App., 401 N.E.2d 97, 100, neither will we ignore it where it is clearly demonstrated. In instructing the jury, the trial court gave defendants' tendered instruction number eight which stated:

"Contributory negligence is the failure of the plaintiff, here Gail Hogsten [sic], to use reasonable care to avoid injury to herself which failure is a proximate cause of the injuries for which recovery is sought. Should you find by the greater weight of all the evidence that Gail Hogsten's [sic] injuries were proximately caused or contributed to by any negligence of Gail Hogsten [sic] as to her own safety, then no recovery may be made by either Gail Hogsten [sic] or Harlan Hogsten [sic] and your verdict should be for the defendant Walter Shroyer [sic], and this is so even though you may also find by the greater weight of all the evidence that Walter Shroyer [sic] was also negligent.

Record at 43. The instruction requires the jury to return a defendant's verdict if it finds that Gail Hogston in any way contributed to her injuries. By allowing defense counsel's inferences to stand unchallenged by a corrective instruction, plaintiffs were prejudiced insofar as the jury could conclude that Hogston was negligent merely by riding the motorcycle.

Because the instruction was erroneously refused and plaintiffs were prejudiced thereby we must reverse the judgment of the trial court and remand this case for a new trial.

Reversed and remanded.

ROBERTSON, P.J., and NEAL, J., concur.