### K MART CORPORATION d/b/a Builder's Square, Inc., Appellant–Defendant,

v.

### Kenneth C. BEALL and Gretchen Beall, Appellees–Plaintiffs.

### No. 49A02–9110–CV–00458.

Court of Appeals of Indiana, Second District.

Aug. 18, 1993.

Rehearing Denied Sept. 16, 1993.

Jim A. O'Neal, Michael A. Wilkins, Ice Miller Donadio & Ryan, Indianapolis, for appellant-defendant.

David L. Byers, Holwager & Holwager, Beech Grove, for appellees-plaintiffs.

SULLIVAN, Judge.

Appellant K–Mart Corporation d/b/a Builder's Square, Inc. (Builder's Square) appeals a jury verdict in favor of Kenneth Beall in the amount of $883,500.00 for personal injuries and resultant damages proximately caused by the negligence of Builder's Square. The issues presented upon appeal are restated as follows:

I. Whether the trial court erred by failing to properly instruct the jury upon the issues of incurred risk and contributory fault;

II. whether the trial court erred by admitting expert testimony concerning the proposed medical treatment plan for Beall;

III. whether there is sufficient evidence to support the trial court's damages instruction upon the elements of the value of lost earnings and the effects of inflation;

IV. whether the trial court submitted the proper verdict form to the jury; and

V. whether the jury's award of damages is excessive?

We affirm.

On October 18, 1986, Beall and his wife, Gretchen, were shopping at a Builder's Square retail hardware store located in Indianapolis. The store is based upon a warehouse merchandising concept in which sales items are displayed upon shelving at levels accessible to customers while additional stock is stored overhead upon large steel shelves. During the regular business day, store employees replenished the displays with stock from the overhead storage.

Customarily, employees worked in pairs, i.e., with one standing atop a platform ladder bringing down additional items and the

second "spotting the ladder." Record at 405. The spotter steadied the ladder and kept a lookout for customers. According to Builder's Square policy, when a customer came into a work area, the employees were to stop stocking and were to assist the customer.

Walter Flagg, a Builder's Square employee, was retrieving several boxes of electrical receptacles (duplex wall sockets) from the overhead storage shelf. When he began the re-stocking, Flagg did not see any customers in the immediate area. Flagg had three boxes of receptacles in his hands when one slipped from his grasp and struck Beall upon the back of the head and the base of the neck. The force of the blow knocked Beall to his knees. Beall estimated that the box, which measured approximately four inches by four inches by eight inches and contained as many as two dozen receptacles, fell from a height of approximately fifteen feet.

At the time of the accident, Beall had been perusing the aisles of the electrical department in search of decorator light bulbs which were kept upon the bottom row of a pegboard display. Beall's attention was drawn to the lower level of the display. Upon direct examination, Beall testified that he did not see the ladder. Upon cross-examination, however, he stated: "I'm sure I saw it.... I must have seen it. I had to almost walk around it. It was right beside me." Record at 270. However, Beall was neither aware of Flagg's re-stocking activities upon the ladder above nor forewarned by Flagg of the falling items.

Beall was dazed by the blow, but did not require immediate medical attention. Later that evening, Beall received pain relief medication at an emergency care center because the pain, soreness, and redness of his neck persisted. Despite a variety of osteopathic, orthopedic, and neurological treatment programs, Beall's condition had

not improved since the date of the accident. Beall received short-term relief from stellate ganglion blocks, a procedure in which an anesthesia is injected into the neck region, but, to date, he continues with a regimen of prescription pain relievers and muscle relaxants to address the constant pain. Beall was ultimately referred to the pain center at the Cleveland Clinic where a recommended treatment plan was proposed, but as of trial had yet to be implemented.

Beall's condition was diagnosed as Reflex Sympathetic Dystrophy (RSD). RSD causes the sympathetic nervous system to reset itself creating a supersensitivity to any stimulus that may produce pain.[1] Due to the chronic pain, Beall severely curtailed his social and business activities.

### I. Instructions Upon Incurred Risk and Contributory Fault

■ Builder's Square asserts that the trial court erred in refusing instructions upon the issues of incurred risk and contributory fault. It is error to refuse a tendered instruction if there is evidence in the record to support the theory set forth in the instruction. *Lewis by Lewis v. Bonahoom* (1991) 3d Dist.Ind.App., 583 N.E.2d 175, 177. Upon appeal, we determine: (1) whether the tendered instruction correctly stated the law; (2) whether there was evidence of record to support giving the tendered instruction; (3) whether the instructions given by the court covered the substance of the refused instruction; and (4) whether Builder's Square, upon a showing of reversible error, was prejudiced by the court's failure to give the tendered instruction. *Hogston v. Schroyer* (1983) 1st Dist.Ind.App., 449 N.E.2d 291, 293.

■ Builder's Square tendered the following instruction which the trial court refused:

1. Dr. Burt, a neurologist who treated Beall, explained RSD as follows:
"The sympathetic system resets [the pain receptors] so they are extremely sensitive to any stimulus that may produce pain, where that stimulus, like touching something, wouldn't

be painful. If the receptors are set wrong, it may become painful just to touch things, or there may be pain without touching or any stimulus." Record at 599 (deposition of Dr. Burt at p. 27).

"When a person knows of a danger, understands the risk involved, and voluntarily exposes himself or herself to such danger, that person is said to have 'incurred the risk' of injury.

In comparing the fault of the parties and deciding whether to apportion fault to the Plaintiffs because they incurred the risk of injury, you may consider the experience and understanding of the Plaintiffs; whether the Plaintiffs had reasonable opportunity to abandon their course of action; and whether a person of ordinary prudence, under the circumstances, would have refused to continue and abandon his or her course of action." Record at 107.

Builder's Square correctly stated the law relating to the defense of incurred risk. *See, e.g., Beckett v. Clinton Prairie School Corp.* (1987) Ind., 504 N.E.2d 552, 554 (defendant entitled to summary judgment upon the issue of incurred risk due to baseball player's knowledge of dangers associated with baseball game); *Ferguson v. Modern Farm Systems, Inc.* (1990) 2d Dist.Ind.App., 555 N.E.2d 1379, *trans. denied* (worker who knew of and appreciated risks associated with unenclosed ladder affixed to a grain barn incurred the risk when he voluntarily climbed ladder). In *Beckett,* our Supreme Court reiterated that incurred risk "demands a subjective analysis focusing upon the actor's actual knowledge and voluntary acceptance of the risk." *Id.* (citing *Kroger Co. v. Haun* (1978) 2d Dist., 177 Ind.App. 403, 379 N.E.2d 1004). A person embarking upon a course of conduct with knowledge of a risk demonstrates venturousness or conscious deliberation above and beyond "the general awareness of a potential for mishap." *Power v. Brodie* (1984) 1st Dist.Ind.App., 460 N.E.2d 1241, 1243 (automobile passenger did not assume the risk of being struck by second vehicle which ran a stop sign at an intersection).

The evidence of record does not merit the application of the propounded law to the facts of this case. Beall's admission that he saw the ladder yet failed to attach any significance to its placement in the warehouse aisle merely indicates "awareness" of its presence. Beall, however, was unaware of the re-stocking activities which were carried on directly above him. The sense of familiarity with one's surroundings does not necessarily rise to the level of conscious deliberation or intentional embarkation upon a course of conduct in the face of danger as required by *Power, supra.* Thus, Beall had neither reason nor opportunity to extricate himself from the aisle before the box struck him. *Goodhart v. Board of Commissioners of County of Parke* (1989) 1st Dist.Ind.App., 533 N.E.2d 605 (error to give incurred risk instruction when passenger in car had no opportunity to abandon or leave vehicle before accident occurred).

Further, Beall was not required to contemplate that a Builder's Square employee would inexplicably drop a box of receptacles even if Beall had noted the employee's actions. *Cf. Brock v. Walton* (1983) 2d Dist.Ind.App., 456 N.E.2d 1087 (motorist need not anticipate dangers created by negligence of other drivers). To be sure, certain activities present inherent dangers that may give rise to the defense of incurred risk.[2] *Beckett, supra; Ferguson, supra.* We are unpersuaded, however, that shopping is one of them. The trial court properly refused the incurred risk instruction tendered by Builder's Square.

Builder's Square also argues, in essence, that the trial court inadequately instructed the jury upon the issue of contributory fault. According to *Hogston v. Schroyer, supra,* 449 N.E.2d at 293, the trial court may refuse a tendered instruction if the instructions given by the court cover the substance of the refused instruction.

---

**2.** Although *Koske v. Townsend Engineering Co.* (1990) Ind., 551 N.E.2d 437 and *FMC Corp. v. Brown* (1990) Ind., 551 N.E.2d 444, cited by Builder's Square, may be applicable in a products liability setting, the cases do little to further the conclusion that the ladder in the aisle was a danger which permits the inference that Beall was aware of and, therefore, accepted the risk of falling objects.

Here, the trial court explained that negligence upon the part of the plaintiff or the defendant is the failure to do what a reasonably careful and prudent person would do under the same or like circumstances. The trial court further instructed the jury upon the standard of reasonable care. Finally, the court instructed that according to Indiana's comparative fault laws, the jury must consider all of the surrounding circumstances in comparing the fault, i.e., the varieties of conduct that make a person responsible in some degree for an injury. Fault was to be apportioned between the plaintiff and the defendant in an amount equal to one hundred percent.

■ Builder's Square characterizes the instructions given as "generalized" and "very brief." Brief of Appellant at 17. To be sure, it is the duty of the trial court to fully and fairly instruct the jury. *Fox v. State* (1986) Ind., 497 N.E.2d 221. It is not required however that the court give an exhaustive exposition upon any or every given point of law.[3] Admittedly, that portion of the refused instruction,[4] the so-called "eyes and ears" instruction which amplified the trial court's negligence instructions, correctly stated the law and perhaps would have provided the jury helpful assistance in resolving the issue. This analysis, however, is not wholly dispositive of the tendered instruction in the instant case. The second half of the instruction contained a defect which cannot be ignored.

The defective portion of the tendered instruction included a statement to the effect that Beall had knowledge of an existing danger and therefore should have been on the lookout for such dangers. As earlier discussed, the evidence does not support the proposition. The trial court was entitled to, if not required to, refuse the entire instruction. *Lazarus Dept. Store v. Sutherlin* (1989) 1st Dist.Ind.App., 544 N.E.2d 513, *trans. denied* (where requested instruction contains multiple propositions, one or more of which are incorrect, entire request is subject to refusal).

Furthermore, in light of the fact that the jury attributed a percentage of fault to Beall, we cannot say that Builder's Square was prejudiced by the failure of the trial court to give the tendered instruction. In fact, Builder's Square succeeded in weaving the "eyes and ears"[5] proposition into its final argument to the jury. The jury was not unaware of the concept embraced within the tendered instruction. The jury was fairly apprised of and acted upon the issue of contributory fault.

## II. *Expert Testimony*

■ Builder's Square contends that the trial court erroneously admitted into evidence the expert testimony of Dr. Ethelee Smith. Specifically, Builder's Square protests the speculative nature of Smith's response to a series of questions regarding the medical options available if the initial course of treatment proposed for Beall did not relieve his condition. The permissible scope of a medical expert's testimony encompasses firsthand knowledge of material facts in evidence as well as knowledge

---

3. Builder's Square points out that the trial court's instructions regarding the duty owed by a building owner "went well beyond the general definitions of negligence and ordinary care and explained those terms in greater detail in the context of the facts of this particular case." Reply Brief of Appellant at 7–8. We fail to see precisely how or why an instruction, for example, that Builder's Square "is under a duty to exercise reasonable care for the protection of customers on the premises" (Record at 1045) expounds in any amount of detail or with any measure of specificity upon the duties of a building owner.

4. Builder's Square's instruction stated:
"I instruct you that everyone has a duty of exercising due care to preserve his or her body and health from injury. Each individual is given strength, reason, ears and eyes as a means of general protection, and he or she is duty bound to employ these under all circumstances in a reasonable manner for the promotion of his or her own personal safety. *Anyone who possesses knowledge of an existing danger, gained through observation, or from experience, is bound to make use of such knowledge, and look out for such dangers as experience has taught him or her is liable to produce injury.*" Record at 104 (emphasis supplied).

5. Builder's Square stated: "You have eyes and ears, and you're capable of detecting perhaps that there is a danger that you should avoid." Record at 1002.

gained from education, experience, study and observation. *Summit Bank v. Panos* (1991) 4th Dist.Ind.App., 570 N.E.2d 960.

Smith, an anesthesiologist at the Cleveland Clinic Foundation, testified as one of Beall's treating physicians. The Clinic includes a pain management center (Center) specializing in the treatment of chronic pain. The Center's staff is comprised of a team of physicians, nurses, physical therapists, and psychiatrists. Upon admission to the Center, a patient receives a wide range of medical and psychological services.

In Beall's case, Dr. Smith completed a thorough review of his medical history, evaluated the results of various diagnostic and therapeutic tests and procedures, and diagnosed his condition as a dysfunction of the sympathetic nervous system resulting in neuropathic pain. After consulting with the Center's staff and concluding that Beall would benefit from the program, Smith formulated a proposed treatment plan. At trial, Smith explained the proposed treatment plan and offered an opinion concerning alternate methods of treatment should the proposed plan fail to produce the expected results.

■■■■ As the trial court aptly pointed out, a medical expert's opinion is necessarily somewhat speculative. Indiana law provides for the admissibility of expert testimony couched in degrees. While evidence of mere "possibility" is not adequate and the law deals in probabilities rather than certainties, we do not exclude relevant evidence which has some probative value. *Beaman v. Hedrick* (1970) 146 Ind.App. 404, 255 N.E.2d 828. *See Noblesville Casting Div. of TRW, Inc. v. Prince* (1982) Ind., 438 N.E.2d 722 (Hunter, J., joined by Prentice, J., with Pivarnik and Givan, JJ., in disagreement upon the proposition and De-Bruler, J., not participating). The trier of fact is entitled to give weight to the evidence according to the degree of its persuasiveness. In any event, one could reasonably expect a team of physicians to anticipate that a secondary course of treatment might be needed in the event that the proposed treatment plan proved unproductive.

The fact that Dr. Smith disclaimed an ability to opine, in detail, the possible effects of the alternate treatment plans and, instead, merely outlined the basic techniques of alternate medical procedures goes to the weight, rather than the admissibility, of her testimony. The trial court did not err in admitting Dr. Smith's opinion of the next accepted method of treating Beall's condition.

### III. *Damages Instructions*

■■■ Builder's Square claims that no evidence was adduced at trial to support the trial court's damages instruction upon the elements of lost wages [6] and the effects of inflation.[7] Our review focuses upon the evidence most favorable to Beall and any reasonable inferences to be drawn therefrom. *Antcliff v. Datzman* (1982) 3d Dist. Ind.App., 436 N.E.2d 114, 122.

In *Antcliff,* the court discussed the propriety of instructing the jury that it "may" consider eight specified elements [8] of damages in determining its award. The court noted that the jury was instructed to "consider the listed elements *only* if they had been proved by the evidence." *Id.* (Emphasis in original.) Further, the court reminded the jury that it could not guess or speculate upon any element of damages for which no evidence was introduced. Here, the jury received a substantially similar cautionary instruction that it must determine damages proven by a preponderance

**6.** Builder's Square equates the terms "lost wages" and "lost income" with the phrase "the value of lost earnings" which the trial court utilized. We proceed upon the basis that wages and income may be subsumed in the concept of lost earnings. But we would observe that income may be derived from other earnings or wages.

**7.** The trial court instructed the jury that it "may consider ... [t]he effects, if any, of the inflation and depreciation or cheapening of money upon losses or harms that will have effects continuing into the future." Supplemental Record at 1–2.

**8.** In *Antcliff,* the appellant challenged an instruction upon the elements of "impaired earning capacity" and "aggravation of a previous injury." *Antcliff, supra* at 122. Our Third District concluded that the record did not contain evidence of an aggravated previous injury. *Id.*

of the evidence and that its determination upon the value of lost earnings, *inter alia,* must not be based upon guess or speculation.

The evidence concerning the value of lost earnings revealed that Beall's productivity and ability to perform certain work-related tasks were significantly curtailed due to his medical condition. Prior to and after his injury, Beall had been self-employed as a consultant and salesman. As a result of his injury, Beall discontinued on-site customer contacts because the sudden onset of pain made it difficult for him to complete sales presentations in a competent manner. Presently, Beall is restricted to performing basic clerical and computer/data entry assignments.

Beall is unable to work for prolonged periods of time without medication because the intense pain destroys his ability to concentrate. When Beall is medicated, he appears "groggy" or "foggy at times" and, consequently, spends six or seven hours finishing assignments that usually require less than one hour to complete. Although Beall works fifty hours per week, some time spent is unproductive and Beall is hampered by an inability to concentrate for protracted periods of time. Additionally, Beall's work schedule was interrupted repeatedly for medical treatment and consultation related to his injury.

This evidence supports Beall's contention that the after-effects of the injury negatively impacted upon his ability to work effectively and efficiently as a consultant or salesman. *Cf. Scott County School District v. Asher* (1974) 1st Dist., 160 Ind. App. 299, 312 N.E.2d 131, *aff'd,* 263 Ind. 47, 324 N.E.2d 496 (1975) (evidence that plaintiff had difficulty in securing and maintaining employment due to injury, as opposed to diminished productivity in the

same job, supported instruction upon "lost earnings").

Concededly, Beall did not present documentary evidence of "lost wages" such as pay stubs showing reduced net earnings for the period of time after his injury.[9] Nor does the actuality of diminished work time and performance necessarily lead to a conclusion of diminished earnings. However, the joint income as reported on the Bealls' 1985 and 1986 tax returns (the years before and after his injury), given the reasonable inference that Gretchen's salary as a bookkeeper remained relatively constant during this time, indicate that the wages that could be fairly attributed to Mr. Beall were reduced by approximately $3,000.00. Based upon this evidence and the reasonable inferences drawn therefrom, the trial court did not err in giving an instruction upon lost earnings.

■ The evidence of the effects of inflation revealed that the cost of Beall's prescription medications increased approximately fifty-seven percent, from $9.29 to $16.29, during 1990–91. Beall also introduced evidence that the estimated cost of the proposed thirty-day treatment at the Cleveland Pain Center, in 1990, was approximately $28,000.00. Logic more than suggests that such costs will escalate in the foreseeable future.

■ A consideration of the effects of inflation do not necessarily require, as Builder's Square insists, the testimony of an expert economist or actuary. As stated in *Colonial Discount Corporation v. Berkhardt* (1982) 1st Dist.Ind.App., 435 N.E.2d 65, 67:

"An awareness of general inflation ... is within the zone of discretion given the trier of facts when assessing damages."

Here, there is some evidence from which the jury could infer that the increased

---

**9.** Builder's Square argues that according to Beall's yearly tax returns, the gross receipts from Beall's S corporations increased in 1988 and 1989 *despite* his injury. Be that as it may, an increase in corporate gross receipts does not necessarily correspond to an increase in the amount of wages or earnings Beall received after his injury. Thus, insofar as Builder's Square relies upon evidence of Beall's tax returns to negate the proposition that he incurred lost earnings, it is inconclusive at best. Alternately, the jury may have concluded that, notwithstanding Beall's diminished business activities, the financial status of the corporation improved due to the efforts and expertise of Beall's son.

health care costs associated with the treatment of Beall's condition were attributable, in part, to the effects of inflation. The trial court properly instructed the jury that it could consider the effects, if any,[10] of inflation in determining Beall's damages.

## IV. *Verdict Form*

█ Builder's Square charges that the trial court erred by submitting the wrong verdict form to the jury. Pursuant to I.C. 34–4–33–6 (Burns Code Ed.Supp.1992), effective in 1990, a trial court *shall* submit a verdict form that requires *only* the disclosure of the percentage of fault charged against each party and the amount of the verdict against each defendant. Builder's Square urges this court to consider that section 6 only establishes threshold informational requirements and that the verdict form should have contained a figure indicating the amount of total damages.

In the instant case, the verdict form submitted by the trial court complied with I.C. 34–4–33–6. The verdict form provided that "[t]he *total damages* of [Beall], having been reduced in proportion to the percentage (%) of fault assigned to [Beall] in Step 1, are $883,500.00." Record at 1075 (emphasis supplied). The jury also received instructions concerning the proper computational model to be used in arriving at the amount of the verdict against Builder's Square.

The underlying thrust of the alleged error, however, is that the trial court could not detect inconsistencies in the verdict because the verdict form failed to show the total damages. The uncertainties associated with general verdict forms have not escaped the attention of reviewing courts. *See, e.g., Perez v. United States Steel Co.* (1981) Ind., 426 N.E.2d 29 (findings of ad-

ministrative board must be specific enough to provide understanding of board's reasoning in articulating findings of ultimate facts); *Broshears v. State* (1992) 1st Dist. Ind.App., 604 N.E.2d 639, 645, *clarified and reh'g denied*, 609 N.E.2d 1 (special verdict form *with* accompanying instructions resolves the uncertainty regarding which convictions jury relied upon in reaching habitual offender determination). To the extent that Builder's Square's argument addresses this concern, it has merit.

As the trial court correctly noted, however, the 1990 statutory amendments to section 6 dispensed with the necessity of showing the calculations used by the jury in reaching its damages award. Had the verdict form in the instant case set forth the total damages, the review of the verdict, at the trial and appellate levels, would have been enhanced. Indeed, notwithstanding Ind.Trial Rule 49, practices such as rendering special findings or submitting interrogatories to the jury, which preserve the decisional process for further consideration, have been encouraged. *See Broshears, supra. Cf. State v. Snyder* (1992) Ind., 594 N.E.2d 783. Be that as it may, we will not require the jury to transcribe calculations in written form when the legislature has clearly removed such a requirement. Although a review of the verdict would have been aided by the inclusion of the total damages in the case before us, the trial court did not err in structuring the verdict form in compliance with the statutory requirements.

Neither can we conclude that the trial court could not review the verdict for inconsistencies pursuant to I.C. 34–4–33–9 (Burns Code Ed.Supp.1992).[11] Section 9 guards against *internal* inconsistencies be-

---

**10.** As Beall correctly points out, the trial court instructed the jury to consider only those elements of damages proved by a preponderance of the evidence. The jury could only consider the effects, if any, of inflation. An instruction that the jury only consider damages, *if any*, that are supported by evidence avoids any prejudice that might result from the given instruction. *Lincoln Operating Co. v. Gillis* (1953) 232 Ind. 551, 114 N.E.2d 873. Moreover, where the damages instruction is multi-faceted, as in the instant case, *and* there is evidence of other ele-

ments upon which the jury properly based its award, the verdict will be sustained. *Antcliff, supra; see, infra* Issue V.

**11.** I.C. 34–4–33–9 provides that the trial court inform the jury of inconsistencies "whenever a jury returns verdicts in which the ultimate amounts awarded are inconsistent with its determinations of total damages and percentages of fault...."

tween the total damages, the ultimate amount, and the percentage of fault. For example, in *Nelson v. Sigman* (1990) 4th Dist.Ind.App., 558 N.E.2d 1115, 1117, an apparent inconsistency existed upon the face of the verdict form in that the computational instructions were erroneous and confusing to the jury.[12] As a result, the total damages, when reduced by the percentage of the plaintiff's fault, did not equal the ultimate award. As Judge Miller noted in his concurrence, the result could be attributed to either a simple mathematical error *or* to a misapplication of the comparative fault laws; thus, a new trial was required.

No such conflict is apparent upon the face of the verdict form in the instant case. Nor is there an allegation that the trial court erroneously instructed the jury or that the jury failed to comprehend or carry out the trial court's instructions to multiply the total amount of damages by the percentage of fault of Builder's Square and to enter a verdict in the product of that amount in Beall's favor. Here, the review of the verdict would have disclosed no irregularity or inconsistency. We conclude that the trial court submitted the proper verdict form to the jury and that the verdict form did not impede the trial court's review of the verdict.

### V. *Excessive Verdict*

Builder's Square claims that the award of $883,500.00 is excessive. Our standard upon review is well-settled: an award will not be set aside unless it is so "flagrantly outrageous and extravagant" that it indicates the jury responded with passion, partiality, prejudice, or corruption. *State v. Daley* (1972) 2d Dist., 153 Ind.App. 330, 287 N.E.2d 552. Further, the amount of damages awarded will be sustained if it is within the scope of the evidence. *Id.*

Here, the trial court instructed the jury to predicate its award upon a consideration of the evidence presented upon nine different elements of damages. The evidence showed that the nature and extent of Beall's injuries and the effect of the injuries severely restricted Beall's ability to function as a whole person in his personal and professional life. The prognosis for Beall's recovery, i.e., the permanent or long-term cessation of pain, was not good. The jury was also apprised of the extent of Beall's physical pain and mental suffering and could reasonably conclude that his pain would persist in the future. As earlier noted, the evidence and inferences which could be drawn therefrom upon the element of the value of lost earnings reasonably suggest that Beall lost approximately $3,000.00 as a result of his injury. Beall also introduced evidence of a significant amount of unreimbursed medical expenses and of projections for expenses related to future medical care, treatment, and services including daily medications and a 30–day out-patient program at the Cleveland Clinic.[13] Dr. Burt, Beall's neurosurgeon, opined that RSD probably disfigured Beall's facial features. Finally, the evidence upon the element of the effects of inflation was of a sufficient quantum to permit consideration in awarding damages. *Ingersoll–Rand Corporation v. Scott* (1990) 2d Dist.Ind.App., 557 N.E.2d 679, 683, *trans. denied.* As discussed under Issue III, *supra,* even if the trial court erroneously instructed the jury upon the element of the effects, if any, of inflation, the verdict here is supported by a preponderance of evidence upon the other enumerated elements. Thus, Builder's Square has failed to prove that "the damage award was so outrageous so as to have necessitated that the jury awarded damages for [the erroneously included elements of damages]." *Antcliff, supra* 436 N.E.2d at 122.

12. The instructions indicated that the jury multiply one percentage (of fault) by another to arrive at the amount of the award. *Id.* at 1117. Obviously, it was impossible for the jury to award the net dollar amount by explicitly following those instructions. *Id.* at n. 2.

13. Since 1987, Beall had undergone at least nineteen stellate ganglion nerve blocks designed to relieve his pain. The results were short-lived and necessitated repeated treatments. Based upon the limited success of Beall's prior medical care, the jury could infer that multiple treatments would be required in the future. Beall's life expectancy was established to be 27½ years.

Here, the jury's award reflects that it considered only those elements which were properly proved at trial and that those elements supported Beall's compensation.

When viewed in its totality, there is sufficient evidence to support the jury's award of damages. Although a different trier of fact might well have reached a different result by weighing the evidence and judging the credibility of the witnesses in a different light, we may not do so.

The judgment of the trial court is affirmed.

MILLER, J., concurs.

SHIELDS, J., concurs and files separate opinion.

SHIELDS, Judge, concurring.

I fully concur. However, I must add a word of caution to the discussion of special findings and interrogatories based upon *Broshears v. State* (1992), Ind.App., 604 N.E.2d 639, *clarified & reh'g denied* (1993), 609 N.E.2d 1. Notwithstanding the assistance provided by these mechanisms, in view of our supreme court's decision in *State Through Highway Dep't. v. Snyder* (1992), 594 N.E.2d 783, I question whether the special verdicts and/or interrogatories, expressly encouraged in *Broshears*, and tacitly encouraged in this case, can perform the function these opinions envision. *Snyder* involved a claim of inconsistent verdicts in a negligence action against an individual defendant, pursuant to the Comparative Fault Act (Act), and against the State of Indiana pursuant to the common law. The State argued the statutorily required language of the verdict forms used under the Act should be treated as "a special verdict or interrogatory to be compared to the general verdict returned by the jury in [the] claim against the State." *Id.* at 786.

In response, a majority of the court emphasized that

> [s]pecial verdicts and interrogatories were eliminated by Indiana Trial Rule 49. Thus the verdict ... cannot be considered by us as a special verdict or interrogatory. We acknowledge that the stat-

utory scheme of the Comparative Fault Act requires that several verdict forms be given to the jury. We view this as an attempt by the legislature to prescribe a procedure by which the jury might be guided through the process of determining fault and assessing damages, and we do not intend to discourage the use of these forms in assisting the jury to properly determine fault and award damages in controversies tried under the Comparative Fault Act. However, we will not consider such verdict forms to be special verdicts or interrogatories. We hold that such forms as are prescribed by the Act will be treated as general verdicts and may not be used to impeach the general verdict returned here in favor of Snyder and against the State.

*Id.*

This statement of policy, followed to its logical conclusion, suggests that any details provided by a jury as to the process by which it arrived at its general verdict served only that limited purpose.